DECISION AND JOURNAL ENTRY
{¶ 1} Defendant, Vinson Shipley, appeals from two judgments of the Lorain County Court of Common Pleas finding him guilty of six counts of sexual battery and one count of corruption of another with drugs and sentencing him to an aggregate of ten years imprisonment. We affirm in part, vacate Defendant's sentence and remand for re-sentencing.
 {¶ 2} Defendant was originally charged in two separate indictments: the first included four counts of sexual battery, under R.C. 2907.03(A)(7), and two counts of corruption of another with drugs, under R.C. 2925.02(A); the second included two counts of sexual battery, under R.C. 2907.03(A)(7). The judge at trial dismissed one count of corruption of another with drugs after the close of the State's evidence. The jury returned a verdict of guilty on all remaining counts.
 {¶ 3} The trial court then sentenced Defendant to an aggregate of ten years for the six sexual battery convictions: two years each for four of the six convictions, and one year each for the remaining two convictions. The judge also sentenced Defendant to two years for the corruption of another with drugs conviction to run concurrently to the sexual battery conviction sentences.
 {¶ 4} Defendant timely appealed, raising thirteen assignments of error. For ease of discussion, we will discuss some of the assignments together and one assignment of error out of order.
 ASSIGNMENT OF ERROR I
"[Defendant] was denied due process and the right to a fair trial when he was convicted of an offense that was instituted beyond the statutory limitations period."
 {¶ 5} In his first assignment of error, Defendant argues that he was denied due process by being convicted of an offense beyond the statutory limitations period. He asserts that all incidents involving the second indictment related to acts occurring more than six years before the indictment.
 {¶ 6} In order to challenge a charged offense on statute of limitations grounds, a defendant must file a motion to dismiss prior to trial. Crim.R. 12(C).[1] See State v. Harrison
(April 15, 1981), 9th Dist No. 9930, at 4. Failure to file a motion to dismiss under Crim.R. 12(C) waives the statute of limitations defense. Crim.R. 12(H). See Harrison, supra, at 4. Defendant in this case never filed a motion to dismiss based on the statute of limitations. He, therefore, has waived this error on appeal. We overrule Defendant's first assignment of error.
 ASSIGNMENT OF ERROR II
"The court erred and [Defendant] was denied due process, when the sexual battery charges in this case were resolved against him on the basis of defective jury instructions."
 {¶ 7} In his second assignment of error, Defendant indicates that his convictions for sexual battery were based on defective jury instructions. Specifically, he alleges that the instructions permitted conviction even if the victim was not enrolled or attending Defendant's school at the time of the acts in question as long as the victim at one time in the past was enrolled or attending that school.
 {¶ 8} Absent plain error, a party waives any challenge to jury instructions in a criminal case unless that party "objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Crim.R. 30(A); State v. Braden, 98 Ohio St.3d 354,2003-Ohio-1325, at ¶ 75. Appellant failed to object at trial to the jury instructions and has not argued plain error. He has waived his right to appeal on this alleged error. See Crim.R. 30(A); State v. Lyons, 9th Dist. No. 03CA0023-M, 2003-Ohio-5783, at ¶ 22; State v. Merryman, 9th Dist. No. 02CA008109, 2003-Ohio-4528, at ¶ 12. We overrule Defendant's second assignment of error.
 ASSIGNMENT OF ERROR III
"The verdicts finding [Defendant] guilty of sexual battery were not supported by evidence sufficient to justify finding of guilt (sic) beyond a reasonable doubt; and thus violated [Defendant's] right to due process."
 ASSIGNMENT OF ERROR IV
"The guilty verdicts were against the manifest weight of the evidence and are contrary to law."
 {¶ 9} In his third and fourth assignments of error, Defendant argues that his convictions were not supported by sufficient evidence or were against the manifest weight of the evidence. Defendant specifically alleges that the State failed to offer evidence showing beyond a reasonable doubt that (1) the occurrences alleged in the first indictment occurred while a student was enrolled or attending classes because they occurred during the summer months, and (2) the occurrences alleged in the second indictment occurred within the required statute of limitations period. As addressed in his first assignment of error, Defendant failed to challenge the statute of limitations before trial. We, therefore, will limit our review to Defendant's other contentions related to sufficiency and manifest weight.
 {¶ 10} Sufficiency of the evidence produced by the State and weight of the evidence at trial are legally distinct issues.State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52. Crim.R. 29(A) relating to sufficiency requires a trial court to order an acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." However, if the record demonstrates that reasonable minds may reach differing conclusions as to the proof of material elements of a crime, a trial court may not grant a Crim.R. 29(A) motion for acquittal.State v. Smith, 9th Dist. No. 20885, 2002-Ohio-3034, at ¶ 7, citing State v. Wolfe (1988), 51 Ohio App.3d 215, 216. "`In essence, sufficiency is a test of adequacy.'" Smith at ¶ 7, quoting Thompkins, 78 Ohio St.3d at 386.
 {¶ 11} While a sufficiency analysis requires a determination of whether the State met its burden of production at trial, manifest weight challenges whether the State met its burden of persuasion. State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at 3, citing Thompkins, 78 Ohio St.3d at 390 (Cook, J., concurring). When a defendant maintains that his conviction is against the manifest weight of the evidence:
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986),33 Ohio App.3d 339, 340.
 {¶ 12} This power is to be invoked only in extraordinary circumstances where the evidence presented at trial weighs heavily in favor of a defendant. Id. A finding that a conviction is supported by the weight of the evidence, also includes a finding of sufficiency of the evidence. Smith at ¶ 9, quotingState v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at 4.
 {¶ 13} R.C. 2907.03(A)(7) prohibits sexual battery:
"No person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender is a teacher, administrator, coach or other person in authority employed by or serving in a school for which the state board of education prescribes minimum standards pursuant to [R.C. 3301.07(D)], the other person is enrolled in or attends that school, and the offender is not enrolled in and does not attend that school."
 {¶ 14} Before looking at the evidence presented in this case, we must first address Defendant's contention that the "enrolled in or attends" language under R.C. 2907.03(A)(7) is not met during the summer months when a student is on vacation. We do not agree with Defendant's definition. Enroll is defined as "to insert, register, or enter (as a person or a fact) in a list, catalogue, or roll[.]" Webster's Third New International Dictionary (1961) 755. While a student may not actually be attending classes during the summer months, that student remains registered on the lists of the school, and therefore is enrolled, until the student either graduates, transfers to a different school, or officially leaves for other reasons. Construing the statutory language in any other manner would produce a very ironic result: teachers would be prohibited from engaging in sexual activity with students during the regular school year, but would be permitted to take advantage of their position of authority over those students during the summer months. This is not what the statute intends.
 {¶ 15} This case involved allegations of sexual conduct by Defendant with two separate students: Kimberly Wright ("Wright") and Elva Flowers ("Flowers").
 State's Evidence Pertaining to Kim Wright {¶ 16} Wright testified that she attended Admiral King High School during the majority of her junior year, where Defendant taught. At no time was she the wife of Defendant. She took his government class while attending that high school. Her first day in class she recalled Defendant telling her that she "looked really good for a white girl." She developed an attraction for him over the school year because he was "comfortably outspoken[,]" and looked his phone number up in the local telephone directory. She would call him often to talk about almost anything. The first time she visited his home, she went to drop off a card for him after he was absent from school for a week due to illness. She then began regularly returning to give him homework because she often skipped classes. Defendant never told Wright that she should not come to his home. Wright went to his home both by herself, and occasionally with her friends Ashley Frame ("Frame") and Richelle Rogers ("Rogers").
 {¶ 17} Wright testified about the first time that she and Defendant kissed. During May 2002, while she was still attending Admiral King High School, she arrived at his home to find another student, Joshua Knowles, working with Defendant on some computers in the kitchen. When she began to leave, she asserted that Defendant asked her to accompany him to his daughter's bedroom so that he could show her a picture. When he could not find the picture, he turned and french kissed Wright.
 {¶ 18} Following that first kiss, Wright continued to return regularly to Defendant's home. The next time she visited, a week later, he gave her a necklace and bracelet. After the first few visits, she started to park down the street, away from Defendant's home, so that her car would "not attract attention." Wright would take her mother's car keys, sneak out of her parents' home late at night, and drive to Defendant's home, sometimes at Defendant's request.
 {¶ 19} During June of 2002, while Wright was still registered on the lists of Admiral King High School as a student, she recalled watching some news with Defendant in his bedroom, holding hands with him, and smoking marijuana with him. Wright indicated that Defendant preferred that she smoked with him than unsupervised and by herself, and stated that Defendant provided the marijuana. Defendant and Wright then engaged in both oral and vaginal sex over a four hour time period. She recalled that Defendant used a condom, a Magnum from his top dresser drawer.
 {¶ 20} When Wright went to leave, Defendant told her not to tell anyone what had happened. He explained that he could lose his job, and she agreed to protect him. He told her "if he ever got caught and locked up for it[,] * * * when he got out of jail he and [Wright] would walk out hand and hand defeating everybody's purpose because [they] would still end up together."
 {¶ 21} A few days later Wright returned again to Defendant's home and engaged in both oral and vaginal sex. Wright testified that her relationship with Defendant lasted for approximately two months: he took her to a ballgame and met him at a movie theater and restaurant. He also smoked marijuana around her on one more occasion, though she denied smoking with him at that time because she had already smoked prior to visiting Defendant that evening. Wright recalled engaging in sexual conduct with Defendant five or six times during the summer of 2002. She testified that her mother never knew she was sneaking out of the house or taking the car keys. She did, however, tell her friends Rogers and Frame about the relationship, and often spoke of it where she worked at Mr. Hero.
 {¶ 22} Wright remembered the day in August 2002 that her father called to tell her the police wanted to speak with her. She originally denied all allegations regarding a sexual relationship between her and Defendant. She told the police that she was attracted to Defendant, and wanted to have sex with him, but that he refused. After her first discussion with the police, though, Wright talked to Defendant. She met him at his home, and he told her that she should stop calling and visiting as much. She still intended to protect Defendant until after her mother confronted Defendant. She then realized that Defendant would hurt her in order to protect himself, and that she could not trust him. Wright, therefore, returned to the police station and told the police the truth about their relationship.
 {¶ 23} Within a few days, the police managed to tape a call between Defendant and Wright. Wright called Defendant from her car on her cell phone. The police did not give her a script of questions, though they did want her to get Defendant to talk about their relationship. Wright told Defendant that she denied everything to the police. Defendant thanked her. He then said that he hoped Wright would keep her word as to what she said she would do in that situation: protect him.
 {¶ 24} At trial, Wright explained in detail the layout of Defendant's house. The State introduced a diagram Wright had drawn of Defendant's bedroom that included small details: the order in which different objects were placed on his bookshelf, a special hanger that hung behind his bedroom door, the location of his condoms underneath other items in the top dresser drawer, the placement of small photographs in a large frame on his bed, and the location of a butterfly necklace which Wright stated Defendant promised to her for her eighteenth birthday. Wright also talked about a few identifying marks on Defendant's body including a mole on his right hip, a bump on his spine, and that he had an "inney" bellybutton. She incorrectly stated that Defendant was circumcised. In order to refute any implications of Wright's incorrect statement regarding whether Defendant was circumcised, the State offered the testimony of the Lorain County corner, Dr. Paul Matus.
 {¶ 25} Wright admitted that she still cared about Defendant. On the day of trial she still had a picture of Defendant in a frame above her bed.
 {¶ 26} The State offered multiple witnesses in support of Wright's testimony. Rodgers and Frame, friends of Wright's from Admiral King High School, testified about the times when they accompanied Wright to Defendant's home. They both recalled at least one time when they parked down the street from Defendant's so that Wright could visit him. Both remembered seeing Defendant's name and phone number on Wright's cell phone, and Frame actually remembered hearing Defendant's voice on Wright's cell phone at one point in time. They both saw Wright purchase Magnum condoms at the gas station where Frame worked.
 {¶ 27} Both girls also stated that they knew about the sexual relationship between Wright and Defendant, though only because Wright talked to them about it. Rodgers indicated that Wright was "really into [Defendant], and that concerned [Rodgers.]" Frame thought "it was gross. [She] didn't think it was right. [She] didn't think they belonged together." Both girls confronted Wright's mother with the information, though they both felt her mother did not believe them
 {¶ 28} Frame, a fellow student in Defendant's government class with Wright, also testified about an incident in class. "[Defendant] basically stuck his penis in front of her. It was up on the desk, kind of draping himself over the desk; and he says, excuse my language, this is how I'm going to have that ass tonight."
 {¶ 29} Joshua Knowles ("Knowles") testified that he attended Admiral King High School and went to Defendant's home on occasions "[t]oo numerous to name" while he was still a student in order to tutor Defendant on computers. Knowles recalled that other students were also occasionally at Defendant's home, and that Wright was there at least two or three times during the summer of 2002. Knowles denied that Wright and Defendant were out of his sight for more than 20 or 30 seconds at a time during those visits. Knowles was also enrolled with Wright in Defendant's government class, and denied the incident recalled by Frame. He stated that Defendant was always very proper in class, and would not use vulgar language.
 {¶ 30} Kenneth Billings ("Billings"), Defendant's neighbor, recalled seeing Wright at Defendant's home on six or seven occasions, though he denied that he had ever seen her there past 7 p.m. He also admitted, though, that he did not always watch Defendant's home, and that he might not know someone was present if they did not park their car in view.
 {¶ 31} Defendant's daughter, Alisha Shipley ("Alisha") also testified. She remembered meeting Wright at Defendant's home in June of 2002. She also recalled going to lunch with Defendant, Wright, and a third student that day — a reward for helping Defendant clean his classroom for the summer. She remembered that Defendant gave Wright a hug at one point in time, though she later stated that the hug was given because Wright received a good report card. Alisha, who was living with Defendant beginning in June 2002, stated that Wright often called Defendant's home, and that she did not remember Wright ever going into her father's bedroom. However, Alisha did admit that she worked the night shift on weekends during the summer of 2002, and would not know if anyone was at Defendant's home while she was working.
 {¶ 32} Wright's mother, Bonnie Wright ("Bonnie"), also testified at trial. She recalled her only parent-teacher conference with Defendant, and indicated it was normal until Defendant "raised his hand and crossed his fingers and * * * said, I get close to my students, but I don't have sex with them." Bonnie stated that she felt her daughter, Wright, was spending too much time with Defendant, though she thought it was due to school work. She remembered that, during the summer of 2002, when Wright was still enrolled at Admiral King High School, Frame and Rodgers confronted her with allegations of the sexual relationship between Wright and Defendant. After the police became involved, she actually went to Defendant's home to confront him. Defendant denied any relationship. While Bonnie admitted that she did not believe the allegations at first, at trial she testified that she knows when her daughter lies, and that Wright was not lying about her relationship with Defendant.
 {¶ 33} Naoma Nimrichter ("Nimrichter"), a co-worker of Wright's at Mr. Hero, recalled that Wright was "like, obsessed * * * continuously that [Wright and Defendant] had a really strong relationship[.]" Nimrichter also saw Defendant's name and phone number appear on Wright's cell phone on more than one occasion. Nimrichter eventually grew so tired of Wright's boasting about her sexual relationship with Defendant that she wrote a letter to the principal at Admiral King High School.
 {¶ 34} After receiving the letter from Nimrichter, Anthony Cassano ("Cassano"), the principal at Admiral King High School, testified that he began an investigation into the matter. He knew and liked Defendant, and thought Defendant was a good teacher. He recalled contacting Defendant by telephone almost immediately upon receiving the letter to confront Defendant, though he had to wait a few days until Defendant returned from vacation. Cassano left a message on Defendant's voice mail, telling Defendant that he needed to talk to him. When Defendant came to Cassano's office, Cassano asked him about the allegations of the sexual relationship between Defendant and Wright. Defendant denied any relationship. Cassano also asked Defendant whether Wright, or any students, were ever at his home unsupervised. Defendant denied both that Wright had been to his house, and that other students had been to his house, unsupervised.
 {¶ 35} Cassano also testified about the complaint procedure in place for teachers to use if a student harasses them. Defendant never used this procedure concerning Wright. He also stated that inappropriate behavior during the school year remains the same as inappropriate behavior during the summer recess. During summer "the bounds of common sense are not going to be lost simply because [the school is] not in session at that time. If [Defendant] did something inappropriate off school grounds * * * or off school hours it would be the same thing." Cassano also indicated that Admiral King High School is a school that is certified to meet set standards under Ohio law.
 {¶ 36} Detective Mark Carpentiere ("Detective Carpentiere"), a thirteen year veteran with the Lorain Police Department, testified about his involvement in the case. Even after his first interview with Wright he felt it was clear that there was some involvement between her and Defendant. He helped to set up the tape recorded phone call between Wright and Defendant.
 {¶ 37} The State played a videotape of the police executing a search warrant for Defendant's home, and Detective Carpentiere explained the tape as it played. The house, he indicated, was laid out almost exactly as Wright had drawn it. Moreover, the detective verified the placement of certain items in Wright's drawing of Defendant's bedroom: clowns and figurines on his bookshelf, the special hanger behind Defendant's bedroom door that could only be seen with the door closed, and the small pictures in the frame on Defendant's bed. He also found the condoms in the top dresser drawer underneath some other objects, and finally uncovered the butterfly necklace in the exact location given by Wright, though he had to look twice to find it.
 {¶ 38} Detective Carpentiere also did a visual inspection of Defendant's body to verify what Wright told him about Defendant's identifying marks. They, in general, matched her description, though she failed to identify a large scar on Defendant's abdomen. However, the detective initially thought the scar was a flap of skin, and did not recognize it as a scar at first.
 {¶ 39} During Detective Carpentier's continued investigation, he also uncovered the name of Elva Flowers after an interview with Defendant's daughter, Alisha.
 State's Evidence Pertaining to Elva Flowers {¶ 40} Detective Carpentiere immediately contacted Elva Flowers at her workplace in order to discover whether the allegations of a second relationship with a student were verifiable.
 {¶ 41} Elva Flowers ("Flowers") testified that she attended Admiral King High School, and took one of Defendant's classes. She recalled that "everyone knew [Defendant] as * * * the cool teacher." During the second week of class, she saw him in the hall and began showing him pictures of her daughter. Defendant's daughter, Alisha, was 15 years old and pregnant at the time, and Flowers remembered Defendant asking her to talk to his daughter about her situation. She agreed. Flowers originally spent time with Defendant and his daughter, both at Defendant's home and at her grandparents' home where she lived, but she eventually spent more time with Defendant alone. After a while, Defendant began to make "passes at [her.]" Flowers remembered the first time Defendant became physical with her: "[Defendant] picked up [her] hand and he kissed [her] hand and then he started kissing [her] all the way up * * * [her] arm and gave [her] a kiss on the cheek[.]" Flowers was shocked. This incident happened during September of Flower's senior year in high school, while she was still enrolled at Admiral King.
 {¶ 42} Flowers and Defendant continued to see each other, often talking on the phone for hours. Flowers testified that they first engaged in vaginal sex on Sweetest Day in 1995, during her senior year of high school. After that, Defendant and Flowers began to spend a lot of time together. They went to the movies, the zoo, and dinner. They even went to Canada during April 1996, the spring before Flowers graduated from high school. While Defendant's daughter Alisha, and his granddaughter Elise were originally going to accompany Defendant and Flowers on the trip, Flowers insisted that only she and Defendant went to Canada. She also produced two ticket stubs from The Phantom of the Opera which they went to see.
 {¶ 43} Throughout this time, Defendant and Flowers continued to regularly engage in vaginal and oral sex. Flowers even kept a diary with symbols on each day she and Defendant engaged in sex: the symbol of a sperm meant unprotected sex and a drawing of a condom showed protected sex. Flowers indicated that she and Defendant had sex together more than 50 times before she graduated from high school.
 {¶ 44} Defendant told Flowers that she could not tell anyone about the relationship. She said that she knew it was wrong, but that she never thought that Defendant could lose his job or face criminal conviction for the relationship. Defendant and Flowers continued their sexual relationship for almost three years after Flowers graduated. Defendant, though, still insisted on not telling anyone about their relationship because he was afraid that it would be traced back to when Flowers was a student at his high school.
 {¶ 45} Flowers never reported her relationship with Defendant to the police. In 2002, she recalled seeing an article in the newspaper about the relationship between Wright and Defendant. After reading the article, she called Defendant, and asked him about the story. Defendant not only denied the relationship, but also denied even knowing who Wright was. Soon thereafter, Detective Carpentiere, during his investigation into Wright's relationship with Defendant, contacted Flowers while she was at work in order to learn more about her prior alleged relationship. Flowers initially lied to the detective, shocked that anyone would ask about the relationship after several years. She eventually, though, decided to tell the detective the truth.
 {¶ 46} Both Flowers' mother, Gerry Schnoering ("Schnoering"), and grandmother also testified at trial. Both recalled Defendant attending family gatherings while Flowers was still in high school. Flowers' grandmother remembered multiple occasions when Defendant would come to pick up Flowers from her home. She saw Defendant kiss Flowers on at least one occasion while Flowers was still in high school, and said that she knew Defendant and Flowers were dating at that time. Schnoering remembered she would baby sit often so that Defendant and Flowers could spend time alone together. Schnoering recalled at least one occasion while Flowers was still in high school that she babysat over night so that Flowers could spend the night at Defendant's home. She also remembered seeing Flowers and Defendant leave for Canada, and denied that Defendant's daughter and granddaughter were present. Schnoering believed that they were engaged in a sexual relationship before Flowers graduated from high school, and recalled Defendant telling her that the relationship had to be secret because "he just didn't want to lose his job and things would cool down after [Flowers] * * * was out of school and everything[.]"
 {¶ 47} A friend of Flowers' from high school also testified that she, too, baby sat on occasion in order for Flowers to spend the night at Defendant's home.
 {¶ 48} Defendant's neighbor, Billings, also remembered meeting Flowers at Defendant's home on multiple occasions. He stated that Flowers' name was carved into the sidewalk in front of Defendant's home after the city repaved it. Billings thought that Flowers and Defendant were involved in a relationship for only about a year during 1998. He did remember Defendant taking Flowers to Canada in 1996, but thought that Defendant's daughter and granddaughter also went with them.
 {¶ 49} Alisha, Defendant's daughter, also testified about Flowers. She recalled that Defendant and Flowers did have a sexual relationship, though she denied that it occurred while Flowers was still a student in high school. She stated that Flowers and Defendant did not go on any trips alone while Flowers was still in high school. Alisha specifically recalled the trip to Canada over spring break in 1996, and indicated that she and her daughter Elise also accompanied Flowers and Defendant. She did not, however, go to see The Phantom of the Opera with them because her daughter, Elise, was too young to attend. Instead, Alisha, only 15 years old at the time, remained alone at the hotel in Canada with her infant daughter for nearly seven hours while her father and Flowers attended the musical.
 Evidence Offered by the Defense {¶ 50} The defense called six witnesses including Defendant to the stand: the first five testified only about Defendant's reputation for truthfulness in the community or Wright's reputation for untruthfulness in the community: Darlene Brown, a retired reporter for the Morning Journal who knew Defendant for approximately 20 years from church; Fred Lozano, a city council man at large for Lorain who was a good friend of Defendant's from politics; Christie S. Kosztyo, who knew Defendant from his involvement with sports announcing, worked on Defendant's political campaign, and had two children attend a class of Defendant's in high school; Nicole Zientarski, a middle school teacher who taught Wright for two years; and Jay Pickering, a science teacher at Admiral King High School who knew Defendant as a teacher and knew Wright as a student. On cross examination, though, each witness who felt Defendant was truthful admitted that certain pieces of information testified to at trial might sway their belief in his truthfulness: that Defendant smoked marijuana, that he took a student to Canada with him for a weekend, that he had students over at his house unsupervised, and that he lied to his school principal about having students at his home.
 {¶ 51} Defendant then took the stand in his own defense. He denied any intimate relationship with Wright, and admitted to a relationship with Flowers only after she had graduated from high school. He indicated that it was not unusual for him to work one-on-one with students, especially in his capacity as proficiency tutor. He thought that teachers and students alike knew that he often had students at his house, which was located only a block from the high school and almost directly across from the football field.
 {¶ 52} He talked about Wright as a person who "had * * * what [he] would call dramatic situations." He, therefore, invited her to talk about those situations. He also would call her back on her cell phone in response to messages she would leave about those situations, which included everything from attempted suicide by drinking Oxi-clean, to allegations that a teacher slapped her and statements that she had cancer. He recalled having extensive conversations with Wright only four or five times over the phone, and indicated that he cared about her. He knew that she and her friends smoked marijuana, but denied smoking it himself regardless of a blood test admitted at trial showing marijuana in his blood at the time of the search warrant in the fall of 2002. He also remembered making the comment about not having sex with students to Wright's mother at the parent-teacher conference, but explained that he said it because he knew Wright previously had problems with other teachers.
 {¶ 53} As to Wright's description of his home, Defendant stated that she was in his house six or seven times and had ample opportunity to learn the general layout. She was also present when he bought the butterfly necklace that she stated was for her eighteenth birthday, and probably saw him put it away. To his knowledge, she never went into his bedroom, though she may have taken the opportunity to walk around while he was not paying attention. He also denied that Wright gave him any condoms, and stated that the condoms found in his top dresser drawer were actually six or seven years old.
 {¶ 54} Defendant denied any sexual relationship with Wright. He stated that he first learned of the allegations after returning from vacation in Canada with his girlfriend. Wright had called him twice, hinting that there might be problems because someone knew about their sexual relationship. Defendant asserted that he told Wright he did not want to talk to her both times, and that he then called a lawyer.
 {¶ 55} Defendant denied that the principal, Cassano, ever left a message regarding the allegations on his voice mail. Instead, Defendant insisted that he, on his own initiative, went to the school to talk to Cassano. Defendant also denied lying to Cassano about whether he had students, including Wright, at his house. He insisted that he admitted both of these things to Cassano, and that Cassano must have incorrectly remembered the conversation.
 {¶ 56} The day after his conversation with Cassano, Defendant asserted that Wright came to his home. She thrust a CD and a note into his hands, and left abruptly, squealing the tires on her car as she left. Later that same day, Wright's mother Bonnie came to confront Defendant about the allegations. He continued to deny them. Against the advice of his attorney, he talked to Wright again on her cell phone. He did not know that the police taped that call, and denied that his conversation implied that any relationship had existed.
 {¶ 57} Defendant admitted that he did some inappropriate things, but only because he permitted Wright to come to his home. He denied taking her to a ballgame or to the movies. He did remember Wright unexpectedly attending a movie with a friend of hers when he was at the theatre by himself. He also remembered that Wright and her friend also unexpectedly appeared at the restaurant where Defendant ate after the movie, and insisted that the two girls must have followed him. He admitted to giving Wright a hug, but only as a reward for receiving a good report card.
 {¶ 58} Defendant also testified about his relationship with Flowers. He talked about the friendship that grew between his family and Flowers' family. He stated that he did take Flowers to Canada during spring break of her senior year in high school, but that he also took his daughter and granddaughter as well. He thought of the trip as taking his daughter and her friend on vacation, and he stayed in a separate part of the hotel suite from the two girls and his granddaughter. Defendant insisted that his sexual relationship with Flowers did not begin until the October after she graduated from high school, almost exactly a year later than Flowers recalled. He also denied ever permitting Flowers to spend the night with him at his house before she graduated.
 {¶ 59} After reviewing the extensive evidence in this case, we find that there is ample evidence in the record to support Defendant's sexual battery convictions. While the State and Defendant introduced conflicting testimony at trial, the mere fact that the jury chose to believe the testimony of the prosecution's witnesses does not render a verdict against the manifest weight. State v. Moore, 9th Dist. No. 03CA0019, 2003-Ohio-6817, at ¶ 18, citing State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at 4. A finding that a conviction is supported by the weight of the evidence also includes a finding of sufficiency of the evidence. Smith at ¶ 9, quoting Roberts, supra, at 4. Accordingly, we overrule Defendant's third and fourth assignments of error.
 ASSIGNMENT OF ERROR V
"[Defendant] was denied effective assistance of counsel when counsel failed to move for the suppression of evidence illegally seized from [Defendant's] home."
 {¶ 60} In his fifth assignment of error, Defendant asserts that he was denied effective assistance of counsel because his trial counsel failed to move to suppress evidence seized from Defendant's home during a search. Defendant implies that the search, made pursuant to a warrant, was actually illegal.
 {¶ 61} In evaluating an ineffective assistance of counsel claim, this court employs a two step process as described inStrickland v. Washington (1984), 466 U.S. 668, 687,80 L.Ed.2d 674. First, the court must determine whether there was a "substantial violation of any of defense counsel's essential duties to his client." State v. Bradley (1989),42 Ohio St.3d 136, 141; State v. Lytle (1976), 48 Ohio St.2d 391, 396. Second, the court must determine if prejudice resulted to Defendant from counsel's ineffectiveness. Bradley,42 Ohio St.3d at 141-42. Prejudice exists where there is a reasonable probability that the trial result would have been different but for the alleged deficiencies of counsel. Id. at paragraph three of the syllabus. Defendant bears the burden of proof, and must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."State v. Colon, 9th Dist. No. 20949, 2002-Ohio-3985, at ¶ 48, ¶ 49, quoting Strickland, 466 U.S. at 687.
 {¶ 62} In this particular case, we find both that counsel's performance was not deficient, and that Defendant suffered no prejudice from counsel's failure to file a motion to suppress. The police conducted the search on Defendant's home, and seized objects in his home, subject to a valid search warrant. Defendant implies, but does not offer any evidence of, the invalidity of the warrant. He contents himself with a blanket assertion that no probable cause existed to issue the warrant, yet fails to even offer evidence as to what the court did rely upon in issuing the warrant. Not only would it be counterproductive to require an attorney to file a frivolous motion to suppress, but no prejudice could result from failing to file that frivolous motion. We overrule Defendant's fifth assignment of error.
 ASSIGNMENT OF ERROR VI
"[Defendant] was denied due process when the trial court did not move the trial to another venue."
 {¶ 63} In his sixth assignment of error, Defendant alleges that the trial court should have granted his motion to change venue. Defendant specifically states that voir dire of the jurors, illustrating that many entertained pre-trial publicity from newspapers or television broadcasts, indicated that Defendant could not get a fair trial in that venue.
 {¶ 64} "Upon the motion of any party or upon its own motion the court may transfer an action * * * when it appears that a fair and impartial trial cannot be held in the court in which the action is pending." Crim.R. 18(B). In this particular case, Defendant never moved to transfer venue. Even if Defendant had moved to transfer venue, Crim.R. 18(B) does not require transfer merely because of extensive pre-trial publicity. State v.Lynch, 98 Ohio St.3d 514, 2003-Ohio-2284, at ¶ 34. The decision to transfer venue lies within the sound discretion of the trial court. State v. Landrum (1990), 53 Ohio St.3d 107, 116. A defendant wishing to transfer venue based on pre-trial publicity must show that one or more of the jurors were actually biased.State v. Treesh, 90 Ohio St.3d 460, 464, 2001-Ohio-4. Prejudice may only be presumed in rare cases. Id.
 {¶ 65} In this case, the jurors who admitted reading or listening to pre-trial publicity also indicated that they could still fairly decide the case based only on the evidence presented at trial. We overrule Defendant's sixth assignment of error.
 ASSIGNMENT OF ERROR VII
"The State's dismissal of African-American and Hispanic members from the jury in the absence of authentic race-neutral reasons and the trial court's failure to make a reasoned determination on the existence of purposeful discrimination denied [Defendant] the right to equal protection."
 {¶ 66} In Defendant's seventh assignment of error, he alleges that the prosecution improperly used peremptory challenges to dismiss black jurors in violation of Batson v. Kentucky (1986),476 U.S. 79, 90 L.Ed.2d 69. He argues that the race neutral reasons espoused by the prosecutor for the dismissal of those minority jurors were pretextual. Defendant also asserts that the judge's failure to make a reasoned determination as to whether the prosecutor was purposefully discriminating against jurors based on race, prior to hearing the prosecutor's race neutral explanations, violated Defendant's due process. We find Defendant's assertions to be without merit.
 {¶ 67} The Equal Protection Clause of the United State Constitution prohibits purposeful discrimination based on race by a prosecutor in his exercise of peremptory challenges. Batson,476 U.S. at 89. Courts should use a three-part test to determine whether a peremptory challenge is improperly based on race.State v. Phillips (Nov. 1, 2000), 9th Dist. Nos. 99CA007297 and 99CA007362, at 4. First, a defendant must illustrate a prima facie case of discriminatory use of peremptory challenges: he must show that all the facts and circumstances surrounding the State's exercise of peremptory challenges, used to exclude members of a cognizable group, raised an inference that the State exercised the peremptory challenges based on the excluded jurors' race. State v. Hill, 73 Ohio St.3d 433, 444-45, 1995-Ohio-287, citing State v. Hernandez (1992), 63 Ohio St.3d 577, 582.
 {¶ 68} After the defendant presents a prima facie case, the burden then shifts to the State to provide a race neutral explanation regarding exercise of the peremptory challenges.Hill, 73 Ohio St.3d at 445. The State's explanation need be neither persuasive nor even plausible. Purkett v. Elem (1995),514 U.S. 765, 767-68, 131 L.Ed.2d 834. "`Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" Id. at 768, quotingHernandez v. New York (1991), 50 U.S. 352, 360, 114 L.Ed.2d 395
(plurality opinion).
 {¶ 69} Finally, the trial court must determine whether the explanation offered by the State is credible and race-neutral, or is actually just pretext for unconstitutional discrimination.Hernandez v. New York, 500 U.S. at 363. The demeanor of the prosecutor exercising the challenges may be the best indicator on the final issue. Id. at 365. Because the trial court is in the best position to judge the credibility of the attorneys during aBatson challenge, this court reviews the trial court's determination as to a Batson challenge under a clearly erroneous standard. Id. at 369.
 {¶ 70} In this particular case, the prosecution used three peremptory challenges to exclude African-American jurors. After Defendant made his Batson challenge, the judge immediately asked the State to articulate race-neutral reasons for the challenges before the judge made any specific finding as to whether Defendant had met the burden for a prima facie case underBatson. Defendant alleges that this was error. This court, though, disagrees: "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." Hernandez v. New York, 500 U.S. at 359.
 {¶ 71} The State then offered its explanations for the exercise of the three peremptory challenges on jurors 5, 10, and 23. Juror 5 indicated during voir dire that she needed to be at work, and was not paid for jury duty. She also stated that she would need evidence beyond someone's word as proof to support a conviction and, apparently, made rude gestures and noises indicating disgust toward the State during voir dire. Juror 10 actually was acquainted with Defendant: Defendant directly spoke with juror 10 during a council campaign many years previously. Juror 23 stated that she had two children who were students of Defendant, and that she had attended parent-teacher conferences with Defendant.
 {¶ 72} The judge found that the State offered race-neutral reasons for exercising its peremptory challenges in this case. The judge also pointed out that the panel still contained one African-American juror, though the State could have exercised its additional peremptory challenges against that juror. We do not think that the judge's finding was clearly erroneous in this case. We overrule Defendant's seventh assignment of error.
 ASSIGNMENT OF ERROR VIII
"[Defendant] was denied due process when the trial court failed to sever indictments which involved separate sets of allegations, different incidents, locations, dates, victims, witnesses, and evidence."
 {¶ 73} In his eighth assignment of error, Defendant argues that the trial court denied him due process by refusing to grant his motion for severance of the two indictments. Defendant asserts that the use of physical evidence and testimony in the Flowers indictment had a "spill-over" effect which prejudiced Defendant, and that the Flowers evidence and testimony improperly bolstered Wright's "incredulous" testimony.
 {¶ 74} Crim.R. 13 permits a court to try two or more indictments together if the offenses could have been joined in a single indictment. Offenses may be charged in the same indictment as separate counts when the offenses charged "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Crim.R. 8(A). Where the offenses charged "are of the same or similar character," the law favors joining multiple offenses in a single trial. State v.Lott (1990), 51 Ohio St.3d 160, 163, quoting State v. Torres
(1981), 66 Ohio St.2d 340, 343.
 {¶ 75} If the defendant may be prejudiced by the joinder, the court may sever the trials under Crim.R. 14. The defendant, though, bears the burden of proving that prejudice, and this court reviews the trial court's decision not to sever for an abuse of discretion. State v. Coley, 93 Ohio St.3d 253, 259,2001-Ohio-1340, quoting Torres, 66 Ohio St.2d 340, at syllabus. A defendant's claim of prejudice may be rebutted by the prosecution in one of two manners. Lott, 51 Ohio St.3d at 163. First, if the offense would be admissible under Evid.R. 404(B), no prejudice could result from joinder. Id. Second, the prosecution may show that the evidence of each crime joined at trial is simple and distinct. Id.
 {¶ 76} More importantly, regarding any motion to sever, "[a] defendant waives any error arising from the denial of his motion to sever made before trial if he does not renew his motion either after the state rests or at the conclusion of all the evidence."State v. Charlton, 9th Dist. Nos. 02CA008049 and 02CA008048, 2003-Ohio-2631, at ¶ 33, citing State v. White (Feb. 21, 2001), 9th Dist. No. 19930, at 9-10; State v. Owens (1975),51 Ohio App.2d 132, 146. In this case, there is no question that Defendant failed to renew his motion to sever at the end of the State's evidence or at the close of all the evidence at trial. Because of this fact, Defendant has waived any error resulting from the denial of his original, pre-trial motion to sever. SeeWhite, supra, at 9-10. Defendant's eighth assignment of error is overruled.
 ASSIGNMENT OF ERROR IX
"[Defendant's] conviction must be reversed where the underlying statute is unconstitutional."
 {¶ 77} In his ninth assignment of error, Defendant argues that R.C. 2907.03(A)(7) is unconstitutional. Specifically, Defendant alleges that the statute "is arbitrary and is a violation of the equal protection clause of the Fourteenth Amendment since it singles out a class of persons [(teachers)] that would otherwise be protected under law." Defendant further asserts that R.C. 2907.03(A)(7) is not rationally related to achieving its purported purpose "because there are numerous examples of undue leverage that the law does not reach * * * [including those] found in employment and religion." We find Defendant's argument to be without merit.
 {¶ 78} Statutes enjoy a strong presumption of constitutionality. State v. Jones, 9th Dist. No. 21270, 2003-Ohio-1918, at ¶ 5. The burden of proving the unconstitutionality of a statute lies with the challenger of that statute. State v. Stallings, 150 Ohio App.3d 5, 2002-Ohio-5942, at ¶ 7. A court will invalidate challenged legislation only when the challenger can show unconstitutionality of the legislation beyond a reasonable doubt. Arnold v. Cleveland (1993),67 Ohio St.3d 35, 38-39.
 {¶ 79} Where the statute at issue does not involve a suspect class or fundamental right, this court employs a rational basis test to determine its constitutionality. State v. Williams,88 Ohio St.3d 513, 530, 2000-Ohio-428. Under the rational basis test, legislation will be upheld against an equal protection challenge if it "bears a rational relationship to a legitimate governmental interest." Adamsky v. Buckeye Local School Dist.,73 Ohio St.3d 360, 362, 1995-Ohio-298. The State must simply show that there is a rational basis for the unequal treatment afforded different groups under the statute. Fabrey v. McDonald PoliceDept., 70 Ohio St.3d 351, 353, 1994-Ohio-368.
 {¶ 80} R.C. 2907.03(A)(7) specifically penalizes teachers, administrators, coaches and other individuals in a position of authority with a public school for an act for which other individuals, not encompassed within another part of the same statute, would not be penalized. See R.C. 2907.03 and 2907.04. The legislature explained in enacting the statute that it intended to protect individuals in a variety of situations where another might take unconscionable advantage of that individual. See 1974 Committee Comment to R.C. 2907.03(A)(7). In 1994, the legislature amended the statute to include 2907.03(A)(7) in response to a case which held that teachers did not fall under any of the classifications in the prior statute. See State v.Noggle, 67 Ohio St.3d 31, 1993-Ohio-189.
 {¶ 81} In this case, R.C. 2907.03(A)(7) is rationally related to its intended purpose of preventing teachers from taking unconscionable advantage of students by using their undue influence over the students in order to pursue sexual relationships. Defendant has failed to show that the statute bears no rational relationship to a legitimate government interest. We, therefore, overrule Defendant's ninth assignment of error.
 ASSIGNMENT OF ERROR XII
"The trial court erred when it imposed consecutive sentences, the aggregate amount of which exceeded the maximum allowable sentence for [Defendant's] most serious offense."
 {¶ 82} In his twelfth assignment of error, Defendant argues that the trial court erred by imposing consecutive sentences the aggregate of which exceeded the maximum allowable sentence for Defendant's most serious offense. Defendant's ten year sentence clearly exceeds the maximum five years allowable for sexual battery. Defendant asserts that the court must make findings on the record supporting imposition of this sentence which exceeds the maximum allowable for Defendant's most serious offense. We find Defendant's assertion meritless.
 {¶ 83} The law requires a court to make specific findings on the record when it imposes the maximum sentence for an offense.State v. Edmonson, 86 Ohio St.3d 324, 326, 1999-Ohio-110. However, we can find no law requiring a court to make additional, specific findings on the record where a court imposes consecutive sentences which aggregate more than the maximum permitted for a defendant's most serious offense, but are not in and of themselves the maximum for each separate offense. The court in this case did not impose any maximum sentence upon Defendant. Rather, it imposed consecutive, less than maximum sentences which aggregated more than the maximum five years allowable for Defendant's most serious offense. The court need not make specific findings in this case. We find Defendant's twelfth assignment of error to be without merit.
 ASSIGNMENT OF ERROR X
"The trial court erred when it sentenced [Defendant] to consecutive sentences without placing its reasons for doing so on the record."
 ASSIGNMENT OF ERROR XI
"The trial court erred when it failed to find that the consecutive sentences imposed were not disproportionate to other sentences for crimes involving similar degrees of seriousness and danger to the public."
 ASSIGNMENT OF ERROR XIII
"The trial court erred when it failed to make a finding, or show any consideration for, why [Defendant] was ineligible for a minimum sentence."
 {¶ 84} In his tenth, eleventh, and thirteenth assignments of error, Defendant argues that the trial court failed to make required findings on the record below in three contexts: (1) imposition of consecutive sentences; (2) disproportionality of his sentences to the seriousness of his crimes; and (3) imposition of more than minimum sentences.
 {¶ 85} According to R.C. 2929.19(B)(2)(c), the trial court must state its reasons for imposing consecutive sentences under R.C. 2929.14. Under R.C. 2929.14(E)(4) the trial court must make one of three statutorily required findings regarding imposition of consecutive sentences including that:
"At least two of the multiple offenses were committed as part of one or more courses of conduct and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct." R.C.2929.14(E)(4)(b).
The Ohio Supreme Court recently held that the trial court must make the required statutorily enumerated findings and give reasons for those findings at the sentencing hearing. State v.Comer, 99 Ohio St.3d 463, 2003-Ohio-4165, paragraph one of the syllabus.
 {¶ 86} When imposing consecutive sentences, the trial court must also explicitly find on the record that consecutive sentences are "necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public[.]" R.C.2929.14(E)(4). Comer also applies to these additional required findings: a trial court must both make the required findings and give its rationale for those findings at the sentencing hearing. See Comer, paragraph one of the syllabus and ¶ 20-21. The court may use the same rationale to support all of the statutorily required findings. See State v. Gray, 1st Dist. No. C-030132, 2003-Ohio-5837, at ¶ 13.
 {¶ 87} When an offender has not served a prior prison term, the law also requires a court to find on the record that either "the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others." R.C. 2929.14(B). The statute only requires the court to make the required finding, and does not explicitly require the court to support that finding with any rationale or evidence. See R.C. 2929.14(B).
 {¶ 88} After reviewing the law applicable to Defendant's three assignments of error related to sentencing, the trial judge must have made the following findings and given the following rationale at the sentencing hearing in order for this court to affirm Defendant's sentence: (1) Consecutive sentences were "necessary to protect the public from future crime or to punish the offender"; (2) "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public"; (3) consecutive sentences were justified by one of the three factors under R.C.2929.14(E)(4), including that "[t]he harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed adequately reflects the seriousness of the offender's conduct"; (4) the rationale required by Comer
supporting each of the first three findings; and (5) that "the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others." See R.C. 2929.14(E)(4) and R.C. 2929.14(B).
 {¶ 89} The sentencing transcript in this case reveals that the judge stated:
"The Court has considered the seriousness, recidivism factors that are listed in [R.C.] 2929.12. The Court has considered the provisions of [R.C.] 2929.14, and the Court has otherwise familiarized itself with respect to finding * * * the consecutive or concurrent nature of these offenses. * * * [T]he Court's judgment is that [Defendant has] violated the trust, [he has] affected the lives of [Wright and Flowers] beyond ways that we will know, and [he has], in this * * * Court's judgment, forfeited [his] liberty."
 {¶ 90} While the journal entry in this case did make the required findings, the trial court made no additional explicit findings at the sentencing hearing. We can hardly fault the trial judge in this respect because this procedure was perfectly proper at the time of sentencing. However, in light of the Ohio Supreme Court's decision in Comer, it is no longer enough: the judge must now make the findings orally at the sentencing hearing. SeeComer at paragraph one of the syllabus.
 {¶ 91} Defendant's tenth, eleventh, and thirteenth assignments of error have merit. We, therefore, vacate Defendant's sentence and remand for the trial court to make the required findings orally at sentencing prior to imposition of sentence.
 {¶ 92} We overrule Defendant's first through ninth and twelfth assignments of error, and affirm the judgment of the Lorain County Court of Common Pleas in those respects. We uphold Defendant's tenth, eleventh, and thirteenth assignments of error, vacate his sentence, and remand for re-sentencing according toComer.
Judgment affirmed in part, sentence vacated, and remanded.
Baird, P.J. and Batchelder, J., concur.
[1] While the State in this case argues that Crim.R. 12(B) and Crim.R. 12(G) apply, we note that Crim.R. 12 was amended on July 1, 2001. The applicable provisions are currently Crim.R. 12(C) and Crim.R. 12(H).