OPINION
{¶ 1} This timely appeal comes for consideration upon the record in the trial court and the parties' briefs. Defendant-Appellant, Clifford Wright, appeals the decision of the Mahoning County Court of Common Pleas that found Wright guilty of aggravated robbery with a firearm specification and sentenced him to a total of eleven years imprisonment. Wright raises seven assignments of error on appeal. In those assignments of error, Wright challenges whether an eyewitness identification should have been suppressed; the trial court's conclusion that the State did not racially discriminate when selecting jurors; a jury instruction; the sufficiency and weight of the evidence; and, his sentence. Each of Wright's assignments of error are meritless and the trial court's decision is affirmed.
 Facts {¶ 2} On July 25, 2001, James Grant was trying to start his wife's car outside an apartment building he managed in Campbell, Ohio. The car stalled that morning and Grant could not get it to start. While Grant was in the car, a young man approached him and asked for the time. After Grant told him it was a little after seven, the man pulled out a revolver, pointed it at Grant, and demanded the car. Grant both told and demonstrated to the man that the car would not start. The man then told Grant that the gun was not real and walked away.
 {¶ 3} Grant called 911 and described the man who robbed him to the operator. Within minutes, an officer arrived on the scene and Grant began describing the man to him as well. Another officer found a man fitting Grant's description near the scene while Grant was talking to the officer. That man was Wright. Grant heard that they had found a suspect on the first officer's radio. The officer then left to help capture the suspect, who had run away. The officers eventually found Wright in a local residence. The gun was never recovered.
 {¶ 4} After arresting Wright, an officer brought him back to the scene of the crime. At this time, which was within an hour of the crime, Grant positively identified Wright as the man who robbed him. Grant saw that Wright was wearing the same distinctive clothing he was wearing at the time of the robbery.
 {¶ 5} Since Wright was a minor at the time of the crime, the State filed a delinquency complaint in the Mahoning County Juvenile Court. That court transferred jurisdiction to the court of common pleas and the Mahoning County Grand Jury indicted Wright for aggravated robbery with a firearm specification.
 {¶ 6} Wright moved to suppress Grant's identification of him as the offender, claiming the procedure used was so highly suggestive that there was a substantial likelihood of misidentification. After a hearing, the trial court denied this motion.
 {¶ 7} The case proceeded to a jury trial. While seating the jury, the prosecutor exercised a peremptory strike against an African-American juror. Wright argued that the prosecutor was engaging in purposeful racial discrimination. The trial court disagreed and allowed the prosecutor to strike this juror.
 {¶ 8} At the conclusion of the trial, the jury found Wright guilty of both aggravated robbery and the firearm specification. At the sentencing hearing, the trial court sentenced Wright to an eight-year term of imprisonment and ordered that term be served consecutive to and after a three-year term for the firearm specification.
 {¶ 9} Wright argues seven assignments of error on appeal. We address those errors in a different order than which they were presented to us.
 Batson Issue {¶ 10} In his second assignment of error, Wright argues:
 {¶ 11} "The trial court erred in permitting the government to use its peremptory challenge in a racially discriminatory manner, thereby denying Appellant equal protection under the law as guaranteed by the U.S. Const. Amend. XIV."
 {¶ 12} In this case, the prosecutor used a peremptory challenge over objection to excuse a prospective African-American juror. The State gave three race-neutral reasons for excusing this juror. Wright claims these reasons were merely pretextual and that the trial court erred when it found them legitimate.
 {¶ 13} A prosecutor violates the Equal Protection Clause of the United States Constitution when she uses preemptory challenges to purposefully exclude members of a minority group because of their minority status. Batson v. Kentucky (1986),476 U.S. 79, 85-86; State v. Bryan, 101 Ohio St.3d 272,2004-Ohio-0971. "The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race." Id. at 86. And Batson
does more than simply proscribe the State from excluding the members of the defendant's race; it bars all racially discriminatory jury selection. Powers v. Ohio (1991),499 U.S. 400, 409. "Race cannot be used as a proxy for determining juror bias or competence." Id. at 410. "A person's race simply `is unrelated to his fitness as a juror.'" Batson at 87, quotingThiel v. Southern Pacific Co. (1946), 328 U.S. 217, 227
(Frankfurter, J., dissenting).
 {¶ 14} Courts analyze a Batson claim in three steps: 1) the opponent of the peremptory strike must make a prima facie case of racial discrimination; 2) the party making the peremptory challenge must present a racially neutral explanation for the challenge; and, 3) the trial court must decide whether the opponent has proved a purposeful racial discrimination. Batson
at 96-98. The party opposing the peremptory strike bears the burden of proving purposeful discrimination. Purkett v. Elem
(1995), 514 U.S. 765, 768; Hernandez v. New York (1991),500 U.S. 352, 359. A trial court's findings of no discriminatory intent will not be reversed unless clearly erroneous. Id. at 365;Bryan at ¶ 106.
 {¶ 15} In this case, the State concedes that Wright made a prima facie case of racial discrimination. But we would not need to address this issue even if the State did not concede the point. Since the prosecutor "offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." Hernandez at 359; State v. White,85 Ohio St.3d 433, 437, 1999-Ohio-0281.
 {¶ 16} A race-neutral explanation for a peremptory strike is simply "an explanation based on something other than the race of the juror." Id. at 360. "[T]he prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause."Batson at 97. But it must relate to the particular case being tried and be both clear and reasonably specific. Id. at 98, footnote 20. A prosecutor cannot rebut the defendant's assertions of racial discrimination by general assertions of good faith. Id. at 98.
 {¶ 17} When an appellate court reviews a Batson claim, it must avoid combining Batson's second and third steps into one.Purkett at 768. When conducting the second step of theBatson, "the issue is the facial validity of the prosecutor's explanation." Hernandez at 360. "The second step of this process does not demand an explanation that is persuasive, or even plausible." Purkett at 767-768. The persuasiveness of the justification only becomes relevant at the third stage of the analysis. Id. at 768. Accordingly, when " evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law." Hernandez at 359. For the purposes of Batson's second step, it does not matter whether the stated reason applied equally between the preempted jurors and the ones actually seated. See Miller-El v. Cockrell (2003),537 U.S. 322, 342-343.
 {¶ 18} In this case, the State gave three reasons for peremptorily striking the juror in question: 1) the juror believed the State had to prove its case beyond a shadow of a doubt, rather than beyond a reasonable doubt; 2) the juror believed that circumstantial evidence alone could not prove the State's case; and, 3) the juror was biased against police for failing to adequately investigate a robbery at her house. These reasons are all race-neutral reasons. See State v. Prade
(2000), 139 Ohio App.3d 676; Akron v. Burns, 9th Dist. No. 21338, 2003-Ohio-3785 (prosecutor's peremptory strike of a juror because of the juror's previous involvement with the police was race-neutral); State v. Poole (1996), 116 Ohio App.3d 513
(prosecutor's peremptory strike of a juror because the juror indicated she might use a higher standard of proof was race-neutral); State v. Shipley, 9th Dist. No. 03CA008275,2004-Ohio-0434; State v. Thomas, 1st Dist. No. C-010724, 2002-Ohio-7333 (prosecutor's peremptory strike of a juror because the juror indicated that he would not accept circumstantial evidence as proof of guilt was race-neutral). Thus, the prosecutor met her burden under Batson.
 {¶ 19} Wright claims the trial court was clearly erroneous when it determined that the prosecutor's preemptive strike was not a purposeful racial discrimination. This issue is "a pure issue of fact, subject to review under a deferential standard."Hernandez at 364. "Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." Batson at 98, footnote 21.
 {¶ 20} Wright claims that the record conclusively demonstrates the prosecutor's explanations were only pretextual. But Wright is incorrect.
 {¶ 21} Wright argues that the State's first explanation is nothing more than an attempt to misconstrue the juror's position in order to justify a race based challenge. He contends that the juror's reference to "beyond a shadow of a doubt" was describing the level of proof she needed to disbelieve an officer's testimony, not the level of proof she would need to convict a defendant of a crime. He also contends that this juror was not the only juror confused by the example the prosecutor used to distinguish between direct and circumstantial evidence.
 {¶ 22} These arguments are incorrect. The prosecutor used a hypothetical to clarify the prospective juror's views about proof issues. According to the hypothetical, the circus is in town and has elephants. A person goes to their backyard and sees the fence knocked over, giant footprints, and peanut shells. The news reports that an animal has escaped from the circus. The prosecutor asked the jurors if they felt this was proof beyond a reasonable doubt that an elephant escaped from the circus and caused the damage. The juror at issue gave a response which raised concerns about the standard of proof this juror would use and demonstrated this juror's discomfort with relying solely on circumstantial evidence when deciding the case. No other juror expressed the same difficulties with these concepts. The prosecutor's concerns about this juror were legitimate.
 {¶ 23} The same holds true for the prosecutor's final explanation for preemptively striking this juror. The juror stated that her house had been broken into, that her neighbors said it was kids in the neighborhood, and that the police did not follow-up on her complaint. She stated that the poor investigation made her "somewhat angry." As Wright correctly points out, other jurors had also been crime victims and were critical of the police. But one juror was critical of the police in New York City. He stated that he believed Ohio police were "definitely" different from those in New York City. The other juror who was the victim of a crime had a police officer in his family. The prosecutor may have reasonably believed there was no need to ask follow-up questions relating to that crime. The only prospective juror who expressed a bias against the local police was Juror Armour.
 {¶ 24} For these reasons, the trial court did not clearly err when it found that the State was not engaged in purposeful racial discrimination when it peremptorily struck this juror. The juror expressed her belief that the State should be held to a higher standard of proof. She found it difficult to make a definitive factual finding based on circumstantial evidence. And she expressed anger with the local police from an investigation into a break-in in her house. Wright's second assignment of error is meritless.
 Identification {¶ 25} In his first assignment of error, Wright argues:
 {¶ 26} "The trial court erred when it denied Appellant's motion to suppress improperly suggestive pretrial identification which violated Appellant's due process rights in contravention ofU.S. Const. Amend. XIV."
 {¶ 27} In this case, Wright was convicted largely because Grant identified him as the perpetrator. He now claims the trial court erred when it denied his motion to suppress Grant's pretrial identification. According to Wright, his actual description did not match Grant's initial description of the suspect and the procedure the police used to obtain the identification was inherently suggestive. In response, the State argues that a variety of factors demonstrate that Grant's initial identification of Wright was reliable.
 {¶ 28} Appellate review of a motion to suppress presents mixed issues of law and fact. State v. Jedd (2001),146 Ohio App.3d 167, 171. The trial court acts as the trier of fact and is in the best position to resolve factual questions and evaluate the credibility of witnesses. State v. Brooks,75 Ohio St.3d 148, 154, 1996-Ohio-0134. Thus, this court must accept a trial court's findings of fact if they are supported by competent, credible evidence. State v. Winand (1996), 116 Ohio App.3d 286,288. Accepting those facts as true, the reviewing court then independently determines whether the trial court's decision met the applicable legal standard. State v. Santini (2001),144 Ohio App.3d 396, 406.
 {¶ 29} Decisions dealing with the admissibility of evidence are left to the trial court's sound discretion. State v.Tibbetts, 92 Ohio St.3d 146, 160, 2001-Ohio-0132. Unless the trial court clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the trial court's decision. State v. Issa,93 Ohio St.3d 49, 64, 2001-Ohio-1290. The phrase "abuse of discretion" connotes more than an error of law or judgment; it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. State v. Adams (1980), 62 Ohio St.2d 151, 157.
 {¶ 30} We note that both Wright and the State cite to pages in the trial transcript when discussing this assignment of error. This is improper. The record contains a transcript of the hearing on Wright's motion to suppress. This contains the evidence before the trial court at the time it ruled on the motion to suppress. When ruling on this assignment of error, we are limited to reviewing the evidence in that transcript. See State v.Gonzales, 151 Ohio App.3d 160, 2002-Ohio-4937; Tallmadge v.Gang (1994), 97 Ohio App.3d 56. Accordingly, we will not consider the trial testimony when judging the merits of this assignment of error.
 {¶ 31} Unreliable identification testimony must be excluded under the Due Process Clause. State v. Myers,153 Ohio App.3d 547, 2003-Ohio-4135, ¶ 30. Identification testimony may be unreliable if a pretrial identification is the result of an impermissibly suggestive pretrial procedure due to the substantial likelihood of irreparable misidentification. Neil v.Biggers (1972), 409 U.S. 188, 198. Thus, a pretrial identification is unreliable if: 1) the witness confronted the suspect before trial; 2) the confrontation was unnecessarily suggestive of the suspect's guilt; and, 3) the identification was unreliable under all the circumstances. State v. Murphy,91 Ohio St.3d 516, 534, 2001-Ohio-0112; State v. Davis,76 Ohio St.3d 107, 112, 1996-Ohio-0414. "[N]o due process violation will be found where an identification does not stem from an impermissibly suggestive confrontation, but is instead the result of observations at the time of the crime." Davis at 112, citingColeman v. Alabama (1970), 399 U.S. 1, 5-6.
 {¶ 32} "[R]eliability is the linchpin in determining the admissibility of identification testimony." Manson v.Brathwaite (1977), 432 U.S. 98, 114. To determine whether an identification is reliable, the court should consider the following factors: 1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of the witness' prior description of the criminal; 4) the level of certainty demonstrated by the witness at the confrontation; and, 5) the length of time between the crime and the confrontation. Id.; State v. Gross,97 Ohio St.3d 121, 2002-Ohio-5524, ¶ 19. The focus of this inquiry "is upon the reliability of the identification, not the identification procedures." State v. Jella (1990),53 Ohio St.3d 22, 27.
 {¶ 33} When the suspect approached Grant that morning, Grant was trying to start his wife's car, which was stalled. The suspect asked Grant for the time and Grant told him it was about five after seven. The suspect then took out a pistol and told Grant to give him the car. At this time, the suspect was standing less than a foot away from Grant. Grant noticed that the pistol was a black revolver. Grant told the suspect that the car wouldn't start. The suspect then told him that the gun wasn't real and walked away.
 {¶ 34} Grant called 911 after the suspect walked away. He described the suspect as "[a] black male, brown short pants, a print shirt, black and brown print shirt, and a baseball cap." At one point, Grant also described the suspect as "a tall, black fellow. He was wearing a black kind of like a jacquard print, like Florida shirt, short pants and a baseball cap." A police officer responded "[j]ust about right away. It looked like they were in the area." As he was speaking to the officer, other officers reported over the radio that they spotted a suspect and the officer he was speaking to left. About ten to fifteen minutes later, the officer returned with Wright in the back seat of his cruiser and Grant positively identified Wright as the man who robbed him.
 {¶ 35} Based on this testimony, we conclude the trial court did not abuse its discretion when it denied Wright's motion to suppress Grant's identification. Grant had an opportunity to observe Wright at the time of the crime and described both Wright and the weapon in a reasonably specific amount of detail. Grant was given the opportunity to identify Wright within, at the most, fifteen to twenty minutes after the crime. Grant was certain that Wright was the individual that robbed him. Finally, while there was no testimony regarding whether Grant's description of Wright was accurate, the police found Wright based solely on Grant's description and Grant was certain Wright was the same man who had robbed him minutes before. These factors all demonstrate that Grant's identification of Wright was reliable. Wright's first assignment of error is meritless.
 Flight Jury Instruction {¶ 36} In his fifth assignment of error, Wright argues:
 {¶ 37} "The trial court erred when it gave the flight jury instruction which created an improper mandatory presumption of guilt in violation of Appellant's rights as guaranteed by theUnited States Constitution Amend. V, VI, and XIV."
 {¶ 38} Wright contends there was no evidence he fled. Thus, he claims the trial court erred when giving a jury instruction on flight. He further argues that the trial court's jury instruction on flight improperly created a presumption in favor of guilt. Thus, he claims his conviction must be reversed. Wright is incorrect. It is undisputed that Wright fled from the police after struggling with the officer when he was first stopped. Much of the officers' testimony describes the search for Wright after he fled. The record supports a jury instruction on flight.
 {¶ 39} The trial court gave the following instruction to the jury:
 {¶ 40} "In this case, there was evidence that the defendant fled from the vicinity of the crime following the alleged aggravated robbery of the vehicle of James Grant, and again following the apprehension by the Campbell Police Department. Fleeing from the vicinity of a crime does not, in and of itself, raise a presumption of guilt or a guilty connection with the crime. That is, you are instructed that you may not presume the defendant guilty from such evidence. You may, however, infer a consciousness of guilt regarding the evidence of the defendant's alleged flight. A defendant's flight and related conduct can be considered as evidence of consciousness of guilt and, thus, of guilt itself."
 {¶ 41} Appellate courts have approved similar jury instructions. In State v. Taylor, 78 Ohio St.3d 15,1997-Ohio-0243, the appellant challenged a similar jury instruction. In that case, the trial court instructed the jury that "flight, in and of itself, does not raise a presumption of guilt, but unless satisfactorily explained, it tends to show consciousness of guilt or a guilty connection with the crime." Id. at 27. The Ohio Supreme Court concluded that "this instruction on flight was neither arbitrary nor unreasonable, and it did not create an improper mandatory presumption." Id.
 {¶ 42} And in State v. Green, 7th Dist. No. 01 CA 54, 2003-Ohio-3074, we recently dealt with a similar issue. In that case, the trial court instructed the jury that "[f]light, in and of itself, does not raise a presumption of guilt, but unless satisfactorily explained, it tends to show a consciousness of guilt or a guilty connection with the crime." Id. at ¶ 28. We concluded this was the same instruction addressed in Taylor and found the appellant's argument to the contrary meritless.
 {¶ 43} The jury instruction in this case is indistinguishable from those given in Taylor and Green. The trial court cautioned the jury that flight does not create a presumption of guilt, but can be considered as evidence of consciousness of guilt. Thus, the trial court's instruction is proper. Wright's fifth assignment of error is meritless.
 Sufficiency and Manifest Weight {¶ 44} Two of Wright's assignments of error deal with the weight and sufficiency of the evidence. In his sixth and third assignment of error, Wright argues respectively:
 {¶ 45} "The verdict reached by the jury was against the manifest weight of the evidence and the evidence was insufficient to support the verdict, thus denying Appellant's due process rights per United States Constitution Amend. XIV and right to a fair trial United States Constitution Amend. VI."
 {¶ 46} "Appellant's conviction of the firearm specification was contrary to law as the government failed to prove beyond a reasonable doubt that the weapon was operable."
 {¶ 47} As the Ohio Supreme Court has stated, arguments concerning the "sufficiency of the evidence" should not be confused with those addressing the "manifest weight of the evidence." See State v. Thompkins, 78 Ohio St.3d 380,1997-Ohio-0052, at paragraph two of the syllabus ("The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different.") "Sufficiency of the evidence" is "`a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" Id. at 386, quoting Black's Law Dictionary (6th Ed. 1990) 1433. The relevant inquiry when determining whether the evidence is sufficient to support the verdict "is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of facts.' Id. at 273. Whether the evidence is legally sufficient is a question of law. Thompkins at 386.
 {¶ 48} In contrast, when reviewing whether a conviction was against the manifest weight of the evidence, we must "examine whether the evidence produced at trial `attains the high degree of probative force and certainty required of a criminal conviction.'" State v. Tibbetts, 92 Ohio St.3d 146, 163,2001-Ohio-0132 quoting State v. Getsy, 84 Ohio St.3d 180, 193,1998-Ohio-0533. In order to do this, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the fact-finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id. "`Weight is not a question of mathematics, but depends on its effect in inducing belief.'" (Emphasis sic.)Thompkins at 387, quoting Black's Law Dictionary (6th Ed. 1990) 1594.
 Aggravated Robbery {¶ 49} Wright was convicted of aggravated robbery under R.C. 2911.01(A)(1). That statute provides:
 {¶ 50} "No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after such attempt or offense, shall * * * [h]ave a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code, on or about his person or under his control." R.C. 2911.01(A)(1).
 {¶ 51} When challenging the sufficiency and weight of the evidence supporting his conviction for aggravated robbery, Wright does not argue that the fact that someone attempted to commit a theft offense while having a dangerous weapon or ordnance under his control. Instead, Wright argues that there was insufficient evidence that he was the person who committed the crime and that the jury's finding to the contrary is against the manifest weight of the evidence.
 {¶ 52} Wright cannot make a colorable argument that his conviction was not supported by sufficient evidence. Grant testified that someone came up to him, pulled out a gun, and demanded that Grant give him the car. At trial, Grant positively identified Wright as the person who robbed him. He had "no question in his mind" that Wright was the same person. Clearly, when this testimony is viewed in the light most favorable to the State, this testimony was sufficient to prove that Wright was the person who committed this aggravated robbery.
 {¶ 53} In his manifest weight argument, Wright claims that Grant's identification of him as the offender does not prove beyond a reasonable doubt that he was the one who committed this crime. In support of this argument, Wright points to differences between the clothing he was wearing and the clothing described by Grant.
 {¶ 54} Grant testified that the man who robbed him was wearing "brown Khaki shorts, a black and brown shirt with a baseball cap, beige brown shorts, like a beige color." He later stated that he remembered the man had "khaki pants, beige pants, the brown and black colored shirt, and the baseball cap." On redirect examination, Grant again described the man who robbed him as wearing "brown, beige shorts, like khaki shorts, a printed brown shirt with black in it, and a baseball cap." Grant told the 911 operator that the man was a "taller black dude" who was wearing "brown cap, brown baseball cap, a print shirt, and brown shorts." And he told the police officer on the scene that the man wore "a brown cap, beige shorts, and a printed shirt."
 {¶ 55} The officer who first reported to the scene testified that Grant described the robber as "a younger black male wearing a brown cap, printed button-down shirt, and khaki pants" and that the man had a slender build. When that officer found Wright, he was wearing "a brown hat, printed-down shirt — button-down shirt, and khaki pants." The officer further testified that he did not see any other men wearing khaki shorts, a printed shirt, and a brown hat that morning.
 {¶ 56} Another one of the arresting officers described Wright as wearing "long shorts, dark-colored pants, and a dark-colored button-up shirt, short sleeve, with like a print on it." The description that officer received of the suspect was "a black male wearing tan shorts, brown baseball cap, and short-sleeve button-down with print on it."
 {¶ 57} The third officer on the scene was told to look for "a black male subject wearing a printed shirt, khaki or tan colored shorts" and "a ball cap." He saw a man fitting that description and that man was eventually arrested. This officer described Wright's shirt as "a Hawaiian-type shirt" with "grays and oranges, maybe some tan colors. I'm not positive. It's been two years ago since I seen the shirt. I know it was a printed shirt." This officer felt that Wright's clothing was "distinctive" and that the shirt was "indescribable." Finally, when this officer brought Wright to Grant so Grant could identify him, Grant testified that Wright was wearing the same clothes as the man who robbed him.
 {¶ 58} Given this evidence, it was not against the manifest weight of the evidence for the jury to conclude that Wright was the man who committed this crime. The various descriptions of what he was wearing differ slightly (khaki shorts vs. brown shorts, the descriptions of Wright's shirt), but these differences all fall within the range of what one would expect when different people are describing the same thing. And most importantly, Grant testified that Wright was wearing the same clothes in the police cruiser that he was wearing when he robbed Grant a few minutes earlier. Thus, Wright's arguments in his sixth assignment of error are meritless.
 Firearm Specification {¶ 59} "R.C. 2923.11(B) and 2929.71(A) require that, prior to imposition of an additional term of three years' actual incarceration for possession of a firearm during the commission of a felony, the state must prove beyond a reasonable doubt that the firearm was operable or could readily have been rendered operable at the time of the offense." State v. Gaines (1989),46 Ohio St.3d 65, syllabus. Wright argues that there is insufficient evidence that the firearm was operable or could readily have been rendered operable at the time of the offense. The State disagrees, pointing to specific evidence it believes is sufficient to support the conviction.
 {¶ 60} In Gaines, the Ohio Supreme Court distinguished between a "deadly weapon", necessary to convict someone for aggravated robbery under R.C. 2911.01(A)(1), and a "firearm", necessary to impose a greater sentence for a firearm specification. See also State v. Cheirs (Dec. 4, 1996), 7th Dist. No. 95 C.A. 139. It found that the two were not synonymous since the legislature defined a firearm as "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. `Firearm' includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable." R.C. 2923.11(B)(1).
 {¶ 61} The State can prove that the weapon was operable or could readily have been rendered operable at the time of the offense in a variety of ways without admitting the firearm allegedly employed in the crime into evidence. Gaines at 69.
 {¶ 62} "When determining whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm." R.C. 2923.11(B)(2).
 {¶ 63} Testimony as to gunshots, smell of gunpowder, bullets, or bullet holes, may establish that the weapon was operable.Gaines at 69; see e.g., State v. Christian (Aug. 27, 1999), 7th Dist. No. 97 CA 171. Thus, in Gaines, the Ohio Supreme Court found the evidence insufficient to support a firearm specification when the only testimony about the weapon concerned its appearance and the witnesses' subjective belief that it was operable. Id.
 {¶ 64} The Ohio Supreme Court later modified Gaines inState v. Murphy (1990), 49 Ohio St.3d 206. In Murphy, it held that proof that the weapon was operable "can be established beyond a reasonable doubt by the testimony of lay witnesses who were in a position to observe the instrument and the circumstances surrounding the crime." State v. Murphy (1990),49 Ohio St.3d 206, syllabus. Thus, evidence that the defendant announced that he was holding-up a store, unwrapped a small gun from a T-shirt, pointed that gun at the store's clerk and customer, and announced he would kill the clerk if the clerk did not give him the money was sufficient to support a conviction on a firearm specification. Id. at 208.
 {¶ 65} The Ohio Supreme Court addressed this subject again inThompkins. In that case, it held that "the trier of fact may consider all relevant facts and circumstances surrounding the crime, which include any implicit threat made by the individual in control of the firearm" when determining whether a weapon was operable. Id. at paragraph one of the syllabus. Thus, a defendant who told a clerk that he was committing a "holdup", pointed a gun at the clerk, and told the clerk to be "quick, quick" could be convicted of a firearm specification since these actions contained an implicit threat to discharge the weapon. Id. at 383-384.
 {¶ 66} "[P]roof of the operability of a firearm can be established by circumstantial evidence, which can consist of the brandishing of a firearm by the defendant and the implicit threat to shoot it." Id. at 385. To hold otherwise would mean "an individual who commits a holdup with a real gun could possibly avoid a firearm specification conviction simply by not saying anything and by not discharging the firearm at the time of the offense. In our judgment, such a result would eviscerate the underlying purposes of the penalty-enhancement provisions of R.C. 2923.11(B)(1) and (2). In Murphy, we noted that in enacting (former) R.C. 2929.71, the General Assembly intended to send a message to the criminal world: "`If you use a firearm you will get an extra three years of incarceration.'" Id.,49 Ohio St.3d at 208, 551 N.E.2d at 934." Id.
 {¶ 67} Since Thompkins, courts have routinely found sufficient evidence to support a firearm specification when the defendant brandished a firearm and implicitly threatens to fire it by pointing it at the victim. See State v. Sanders (1998),130 Ohio App.3d 92, 101 (The gun was pointed at a victim when she was ordered out of her car and the defendant cocked the gun and pointed it at another victim when taking that victim's money);State v. McElrath (1996), 114 Ohio App.3d 516, 520 (Defendant pointed gun at customers and bartender while another man took cash from the register); State v. Pierce, 10th Dist. Nos. 02AP-1133, 02AP-1134, 2003-Ohio-4179, ¶ 20 (Defendant pointed gun at victim through a car window while demanding money); State v.Jackson, 10th Dist. No. 02AP-468, 2003-Ohio-1653, ¶ 44-45 (Defendant pulled gun and stuck it to the victim's head while demanding money); State v. Macias, 2nd Dist. No. 1562, 2003-Ohio-1565, ¶ 15 (Defendant pointed what appeared to be a real gun at the victim demanded her money); State v. Robinson,
8th Dist. No. 80718, 2003-Ohio-0156 (Defendant shoved a rifle barrel into the victim's back when the victim did not respond to another gunman's orders).
 {¶ 68} In State v. Haskins, 6th Dist. No. E-01-016, 2003-Ohio-0070, the appellate court also found that there was sufficient evidence based on the circumstantial evidence. In that case, the victim never saw a firerarm, but the defendant threatened to pull one out of his pocket if she did not give him the money. "Although no firearm was actually visible to the victim or found, the effect on the hearer was that appellant had a firearm and threatened to use it. Thus, we conclude that appellant's explicit threat, when construed most strongly in favor of the state, provides sufficient evidence from which any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. at ¶ 47; see also State v. Gamble, 2nd Dist. No. 2001 CA 61, 2002-Ohio-3289 (The defendant committed a robbery while physically brandishing a gun and both of the victims were frightened by it and felt threatened and afraid).
 {¶ 69} The facts in this case are, for the most part, similar to the ones described above. Wright pointed a gun at Grant's face while robbing him. Grant, a man with ten years of military experience and who was familiar with guns, "was quite sure" the gun was a real gun. He saw that the gun was a revolver and that it had bullets in the cylinder. These facts appear sufficient to support a firearm specification conviction.
 {¶ 70} The only fact that distinguishes this case from those mentioned above is that after Grant told Wright that the car would not start, Wright told Grant that the gun was not real. But that the fact that Wright made this statement does not render the facts that would normally support a firearm specification conviction insufficient. If we held otherwise, then a defendant could brandish a weapon, point it at a victim, and demand money, but not be found guilty of the firearm specification if the defendant simply stated that the gun was not real after the defendant committed the robbery. This result "would eviscerate the underlying purposes of the penalty-enhancement provisions of R.C. 2923.11(B)(1) and (2)" in the same manner criticized by the Ohio Supreme Court in Thompkins. Thus, there are sufficient facts supporting Wright's conviction for the firearm specification. Wright's third assignment of error is meritless.
 Cumulative Error {¶ 71} In his seventh assignment of error, Wright argues:
 {¶ 72} "Appellant was denied his right to a fair trial in violation of the United States Constitution Amend. VI and XIV as a result of the cumulative error which occurred throughout the trial."
 {¶ 73} Wright claims that the cumulative affect of each of the alleged errors addressed above deprive him of his right to a fair trial. The State responds by claiming that no errors occurred, so multiple errors could not accumulate.
 {¶ 74} Although a particular error might not constitute prejudicial error in and of itself, a conviction may be reversed if the cumulative effect of the errors deprives appellant of a fair trial, despite the fact that each error individually does not constitute cause for reversal. State v. DeMarco (1987),31 Ohio St.3d 191, paragraph two of the syllabus. However, the doctrine of cumulative error is not applicable where appellant fails to establish multiple instances of harmless error during the course of the trial. State v. Garner, 74 Ohio St.3d 49, 64,1995-Ohio-0168. A defendant claiming cumulative error must make "a persuasive showing of cumulative error." State v. Sanders,92 Ohio St.3d 245, 279, 2001-Ohio-0189. Wright has not demonstrated multiple instances of harmless error that occurred at trial. Thus, his seventh assignment of error is meritless.
 Sentence {¶ 75} In his fourth assignment of error, Wright argues:
 {¶ 76} "The trial court abused its discretion when it imposed more then the minimum sentence without making factual findings to support the sentence as required by Ohio Revised Code 2929.14(B) in violation of U.S. Constitution Amend. VII and XIV; Ohio Const. Art. I, Sec. 1, 2, 9, and 16."
 {¶ 77} According to Wright, the trial court could not sentence him to more than the minimum without making a finding under R.C. 2929.14(B) and it did not do so. The State concedes that a trial court cannot sentence a defendant for a felony to more than the minimum without making the findings required by R.C. 2929.14(B), but contends that the trial court made those findings. In particular, the State contends that the terms Wright served in the Ohio Department of Youth Services count as a "previously served prison sentence" and that the trial court's factual findings support a finding that the minimum sentence would demean the seriousness of the offense and/or not adequately protect the public.
 {¶ 78} When reviewing a felony sentence, we may only vacate, increase, reduce, or otherwise modify a sentence if we clearly and convincingly find either that the record does not support the sentencing court's findings or that the sentence is otherwise contrary to law. R.C. 2953.08(G)(2).
 {¶ 79} When sentencing an offender, the trial court must consider several aspects of the sentencing statutes. First, it must follow the overriding purposes of felony sentencing, namely, to protect the public from future crime by the offender and others and to punish the offender. R.C. 2929.11(A). The court must also consider the need for "incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both." Id. Further, the sentence must be commensurate with and not demeaning to the seriousness of the offender's conduct and its impact on the victim and be consistent with sentences imposed for similar crimes committed by similar offenders. R.C. 2929.11(B). Keeping these purposes in mind, if the offender has not previously served a prison term, R.C. 2929.14(B) presumes the imposition of the shortest prison term for an offense.
 {¶ 80} If an offender has not previously served a prison term, the trial court may only impose a sentence beyond the minimum term when it specifically finds on the record that the shortest prison term either would demean the seriousness of the offender's conduct or would not adequately protect the public from future crime by the offender. R.C. 2929.14(B). The trial court is not required to explain its finding. Rather, the trial court "must note that it engaged in the analysis and that it varied from the minimum for at least one of the two sanctioned reasons.' State v. Edmonson (1999), 86 Ohio St.3d 324, 326,1999-Ohio-0110.
 {¶ 81} Wright was convicted of aggravated robbery, a first degree felony. The minimum sentence for this crime is three years. R.C. 2929.14(A)(1). The trial court sentenced Wright to eight years for this offense. Thus, the trial court was obliged to comply with R.C. 2929.14(B).
 {¶ 82} The State first argues that the trial court did not need to make either of the findings required by R.C. 2929.14(B) since Wright had previously served a prison term. The State contends that Wright served what it calls "juvenile prison" terms with the Department of Youth Services and that this should count as a "prison term" under the statute. This argument is meritless.
 {¶ 83} R.C. 2929.01(CC) defines a "prison term" as:
 {¶ 84} "(1) A stated prison term; (2) A term in a prison shortened by, or with the approval of, the sentencing court pursuant to section 2929.20, 2967.26, 5120.031, 5120.032, or5120.073 of the Revised Code; [or] (3) A term in prison extended by bad time imposed pursuant to section 2967.11 of the Revised Code or imposed for a violation of post-release control pursuant to section 2967.28 of the Revised Code."
 {¶ 85} Time served with the Department of Youth Services does not qualify as a prison term under any of these definitions. Thus, according to the plain language of the statute, the time Wright served with the Department of Youth Services is not a "prison term" for the purposes of R.C. 2929.14(B). The trial court was obligated to make one of the findings in R.C. 2929.14(B) to sentence Wright to more than the minimum possible prison term.
 {¶ 86} In its sentencing entry, the trial court specifically found that Wright "poses the greatest likelihood of recidivism." This finding is clearly sufficient under R.C. 2929.14(B). But this does not resolve this assignment of error. "[A] trial court is required to make its statutorily sanctioned findings on the record at the sentencing hearing." State v. Comer,99 Ohio St.3d 463, 2003-Ohio-4165, ¶ 26. Thus, the fact that the trial court made the necessary findings in its sentencing entry is irrelevant if it did not do so at the sentencing hearing.
 {¶ 87} R.C. 2929.12(D) lists a variety of factors that indicate that an offender is likely to commit future crimes. These include previous adjudications of delinquency or criminal convictions and unresponsiveness to previous sanctions. R.C. 2929.12(D)(2), (3). When sentencing Wright, the trial court went through Wright's extensive criminal history in detail, mentioning that this would make recidivism likely. This history included a finding of delinquency for sexual imposition, unauthorized use of a motor vehicle, burglary, attempted burglary, complicity to burglary, and probation violations. Furthermore, the trial court noted that Wright was arrested for this offense only seven days after being placed on parole for one of his offenses.
 {¶ 88} Although these facts may have supported a finding that a minimum prison term would not adequately protect the public from future crime by the offender, the trial court did not make that finding before announcing Wright's sentence. Nevertheless, Wright's attorney requested a stay of sentence afterward. When denying that motion, the trial court stated that Wright's "history shows that the only way you can protect the public from the crimes he has committed is to keep him incarcerated." Accordingly, the trial court made the required finding at the sentencing hearing even though it did not do so before announcing the sentence.
 {¶ 89} There is nothing in R.C. Chapter 2929 which requires that the trial court make the required findings before
announcing the sentence it is imposing upon an offender.
 {¶ 90} "Except as provided in division (C), (D)(1), (D)(2), (D)(3), or (G) of this section, in section 2907.02 of the Revised Code, or in Chapter 2925. of the Revised Code, if the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender and if the offender previously has not served a prison term, the court shall impose the shortest prison term authorized for the offense pursuant to division (A) of this section, unless the court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others." R.C. 2929.14(B).
 {¶ 91} Thus, the trial court did not violate R.C. 2929.14(B) when it imposed more than the minimum possible sentence on Wright. Wright's fourth assignment of error is meritless.
 {¶ 92} Each of Wright's assignments of error are meritless. Accordingly, the judgment of the trial court is affirmed.
Waite, P.J., concurs.
Donofrio, J., concurs.